**Joselito VITUG, Plaintiff–Appellant,**

v.

**MULTISTATE TAX COMMISSION, Dan R. Bucks, as Executive Director, Les Koenig, as Director of Audit, et al., Defendants–Appellees.**

No. 94–3092.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1995.

Decided July 8, 1996.

508

Charles W. Newcom (argued), James G. Fiero, Sherman & Howard, Denver, CO, Paul R. Garry, Judith Y. Gaston, Bates, Meckler, Bulger & Tilson, Chicago, IL, for Multistate Tax Com'n., Dan R. Bucks, Les Koenig, Member Com'rs.

Before CUMMINGS, CUDAHY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Joselito Vitug worked for almost eight years as an auditor for defendant Multistate Tax Commission. When Vitug was passed over for a promotion, and when subsequent in-house grievance procedures failed to remedy the situation, he resigned, claiming that defendants' conduct had made working conditions intolerable. After filing a claim of national origin discrimination with the appropriate state and federal agencies, Vitug brought suit in district court, alleging that the defendants' failure to promote him, as well as his subsequent "constructive discharge," constituted discrimination on the basis of his religion and national origin in violation of Title VII. The district court granted summary judgment in favor of the defendants on all counts, and Vitug filed a timely notice of appeal. Because we find that Vitug has failed to put forth any meaningful evidence supporting his claims, we affirm the judgment of the district court.

## I. HISTORY

Joselito Vitug, a male Filipino who immigrated to the United States from the Philippines in March of 1971, was employed as an auditor for the Chicago office of the Multistate Tax Commission ("Multistate") from April 1985 to January 1, 1993. On June 10 and 11, 1991, Vitug was one of six applicants to interview for the position of field audit supervisor, a position superior to Vitug's job of senior joint auditor. The applicants were interviewed by a panel of three Multistate employees: Les Koenig, a white male who was Vitug's manager at the time of the interview; Alice Davis, an African–American female; and Anita Williams, a white female. Each applicant was asked the same ten questions in the same order. The three inter-

Robert M. Motta (argued), Kevin E. Bry, Lavelle, Juneau & McCollom, Oak Park, IL, for Joselito Vitug.

viewers separately assigned scores to each applicant's responses, tallied each applicant's total score, and ranked each applicant's overall performance against the other applicants. At the end of all the interviews, the panel members compared and discussed their individual rankings of the applicants, and they reached a consensus as to the most qualified applicant.

All three interviewers ranked Vitug the lowest of the six applicants. Harold Jennings, a white male, was unanimously considered the highest ranking applicant and was offered the position. As it turns out, Koenig and Jennings are both born-again Christians and are members of the same independent Lutheran church.[1] In fact, Jennings had learned of the opening for the field audit supervisor position from Koenig at a church meeting. Davis, although not a member of the church, has attended services on previous occasions with Koenig.

Later that week, the same interview panel interviewed four applicants to fill a similar position in Multistate's New York office. The panel members utilized the same interview procedure and asked the applicants the same ten questions as they had in Chicago. A white woman received the highest scores from the panel, but she declined the position. The panel's second choice, an Asian male named George Fung, was then offered the position, and he accepted.

When Vitug was notified on June 20, 1991, that he had not received the field audit supervisor position, he immediately filed a grievance with Multistate. Scott Smith, an in-house attorney from Multistate's Washington, D.C., office, held a hearing to evaluate Vitug's complaints. After the hearing, Smith issued a written memorandum on August 16, 1991, recommending that Vitug's grievance be denied. Further hearings were conducted in September 1991 by Multistate's executive

director, Dan Bucks, and in a letter to Vitug dated January 29, 1992, Bucks formally denied the grievance.

On April 10, 1992, Vitug filed a charge of race and/or national origin discrimination with the Illinois Department of Human Rights (the "IDHR"). However, with certain exceptions, the Illinois Human Rights Act does not apply to businesses with fewer than fifteen Illinois employees. 775 ILCS 5/2–101(B)(1). Multistate does not employ fifteen or more persons in Illinois (a fact admitted by Vitug in his IDHR filing), and thus the IDHR referred Vitug's charge to the Equal Employment Opportunity Commission (the "EEOC") on May 17, 1992. The EEOC subsequently issued a right-to-sue letter in June of 1993 dismissing Vitug's charge and determining that "[t]here is no evidence that [Vitug's] national origin was a factor in [Multistate's] decision to select a non-Filipino to fill the position in question," and that "the evidence obtained during the investigation does not establish a violation of the statute."

On December 16, 1992, Vitug tendered his letter of resignation to Multistate, effective January 1, 1993. In the letter, he stated: "The discriminatory conduct of the Multistate Tax Commission in its selection and promotion processes has caused me severe distress. The circumstances surrounding the denial of my promotion to Field Audit Supervisor has [sic] created a hostile work environment."

Within ninety days of the EEOC's issuance of a right-to-sue letter, on September 1, 1993, Vitug filed this lawsuit in district court, alleging that Multistate's failure to promote him, as well as his subsequent "constructive discharge," constituted unlawful discrimination on the basis of his race and/or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[2] Vitug

1. Vitug continually refers to Koenig, Jennings, and Davis as "born-again Christians." We are not aware of any organized religious group bearing the label "born-again Christians"; Koenig and Jennings belong to a church designating itself as Lutheran. Nevertheless, given that the relevant question is whether Vitug was discriminated against on the basis of his religion, not whether he has correctly identified Koenig's and Jennings's religious group, we will use Vitug's

designation throughout this opinion. We assume that by "born-again Christians," Vitug refers to those Protestants who consider their conversion to be a spiritual rebirth. See John 1:12–13, 3:3–6.

2. Vitug's complaint also alleged violations of 42 U.S.C. § 1981, claiming that Multistate's conduct had infringed upon his fifth and fourteenth amendment rights. See U.S. CONST. amends. V,

amended his complaint during the pendency of the proceedings to add a claim that because he is Catholic, while Koenig and Jennings (and presumably Davis) are born-again Christians, his being passed over for promotion and his alleged constructive discharge amounted to discrimination on the basis of his religion as well.

The defendants moved for summary judgment on all counts. In ruling on the motion, the district court first addressed Vitug's claims that Multistate's failure to promote him constituted religious and national origin discrimination. The district court noted that as a condition precedent to maintaining a Title VII action in district court, a plaintiff must file a timely charge of discrimination with the EEOC. See *Weiss v. Coca–Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir.1989)); *Perkins v. Silverstein*, 939 F.2d 463, 469–70 (7th Cir.1991). Normally, a plaintiff must file his charge with the EEOC within 180 days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e–5(e). But where the plaintiff initially institutes proceedings with "a state or local agency with authority to grant or seek relief from such practice," the charge is timely if filed within 300 days of the discriminatory employment practice. 42 U.S.C. § 2000e–5(e)(1).

Vitug filed his charge of discrimination with the IDHR 294 days after he was denied his promotion. However, because Multistate had fewer than fifteen Illinois employees and thus was not considered by the IDHR to be an "employer" covered by the Illinois Human Rights Act, 775 ILCS 5/2–101(B)(1), the IDHR referred the case to the EEOC. From this, the district court held that the IDHR did not have "authority to grant or seek relief from such practice" as required for a 300–day filing window under § 2000e–5(e)(1). Thus, the court held that Vitug's failure to promote claim was untimely because Vitug had filed his charge with the EEOC outside the applicable 180–day window, and the court

granted summary judgment in favor of the defendants on that issue.

Turning to Vitug's claims of discriminatory constructive discharge, the district court held that such claims were timely because Vitug had filed his charge with the IDHR within 180 days of his resignation. However, the court granted summary judgment in favor of the defendants on Vitug's claim that his alleged constructive discharge constituted religious discrimination because Vitug had never filed a charge of religious discrimination with the EEOC and thus had failed to exhaust his administrative remedies. The district court finally reached the merits of what it considered to be Vitug's only procedurally viable claim: that he had been constructively discharged by Multistate and that such discharge had been discriminatorily based on his national origin. Nonetheless, finding that Vitug had adduced no evidence supporting his contention that his alleged constructive discharge was discriminatory either under a disparate impact or a disparate treatment theory of discrimination, the district court granted summary judgment for the defendants on this claim as well.

## II. ANALYSIS

 We exercise plenary review over a district court's grant of summary judgment, *Green v. Shalala*, 51 F.3d 96, 99 (7th Cir. 1995), and it is well settled that we may affirm the district court's decision on any sufficient basis supported by the record, *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 359 (7th Cir.) (citing cases), cert. denied, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). In reviewing a motion for summary judgment, we must consider all facts in the light most favorable to the nonmovant, resolving all inferences in his favor. *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir.1992) (citing *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132, 1139 (7th Cir.1992)); *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991) (quoting *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990)). Under FED. R. CIV. P. 56(c), sum-

XIV. However, the district court granted summary judgment in favor of the defendants on these allegations, and Vitug does not appeal that

decision. Thus, in this opinion we refer only to Vitug's Title VII claims, which form the basis for his appeal.

mary judgment is warranted only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." The initial burden of production rests with the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant fails to demonstrate a genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party...." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). See also *Sokaogon Chippewa Community v. Exxon Corp.*, 2 F.3d 219, 225 (7th Cir.1993), cert. denied, — U.S. ——, 114 S.Ct. 1304, 127 L.Ed.2d 655 (1994); *Colosi v. Electri–Flex Co.*, 965 F.2d 500, 503–04 (7th Cir.1992).

On appeal, Vitug asserts that the district court erred in finding his failure to promote claims to be untimely. Vitug contends that he did file a charge with a state agency possessing the "authority to grant or seek relief from such practice," and therefore the district court should have applied a 300–day window in determining whether his EEOC filing was timely. In support of this contention, Vitug argues: (1) that § 2000e–5(e)(1)'s "authority to grant or seek relief from such practice" requirement should be interpreted to refer to a state agency with the authority to redress plaintiff's type of claim, not plaintiff's specific claim; and (2) that Multistate is a "party to a public contract" and therefore is an "employer" subject to the Illinois Human Rights Act under 775 ILCS 5/2–101(B)(1)(d), despite its having fewer than fifteen Illinois employees.

Vitug further asserts error in the district court's finding that he failed to exhaust his administrative remedies for his claims of reli-gious discrimination, arguing (1) that his claims of religious discrimination are reasonably related to and grow out of his claims of national origin discrimination and thus should relate back to the time of his initial IDHR filing, see *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir.1992); and (2) that he could not have included a claim of religious discrimination in his earlier filing because the basis for such a claim became apparent only after he had conducted discovery depositions. We need not address any of these procedural arguments, however, for even if we were to find that Vitug properly complied with all relevant procedural requirements, his claims of religious and national origin discrimination relating to both Multistate's failure to promote him and his alleged constructive discharge falter on their merits.

A. Vitug's Failure to Promote Claim

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1)–(2). The bulk of Vitug's amended complaint is devoted to detailing the circumstances surrounding Multistate's decision not to promote him to the position of field audit supervisor and then claiming that Multistate's failure to promote him was discrimination on the basis of his religion and national origin in violation of Title VII.

Vitug may prove this claim by demonstrating either that Multistate's failure to promote him was "disparate treatment" or that Multistate's procedures for determining

promotions have a "disparate impact." *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 645–46, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 985–87, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Disparate treatment, "the most easily understood type of discrimination," occurs when a plaintiff is intentionally treated less favorably than others simply because of his race, color, religion, sex, or national origin. *Watson,* 487 U.S. at 985–86, 108 S.Ct. at 2784 (quoting *Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). See also *Wards Cove Packing,* 490 U.S. at 645, 109 S.Ct. at 2118–19. It requires the plaintiff to prove that the defendants acted with actual discriminatory intent. *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784. A claim of disparate impact, on the other hand, does not require a showing that the defendants intended to discriminate against the plaintiff. *Wards Cove Packing,* 490 U.S. at 645–46, 109 S.Ct. at 2119. A disparate impact exists where a specified employment practice, although neutral on its face, has a disproportionally negative effect on members of a legally protected class. *Watson,* 487 U.S. at 986–87, 108 S.Ct. at 2784–85. The disparate impact theory of Title VII liability may be utilized to challenge both objective and, as here, subjective selection processes. *Id.* at 991, 108 S.Ct. at 2787.

### 1. *Disparate impact*

In order to establish a prima facie case of disparate impact, a plaintiff must first isolate and identify "the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* at 994, 108 S.Ct. at 2789. Once the plaintiff has indicated these allegedly discriminatory employment practices, he must demonstrate causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Id.*

Vitug has satisfied the first half of this burden by singling out Multistate's "word-of-mouth recruitment, and purely subjective evaluations based upon oral interviews" as the practices he claims have a discriminatory effect. To establish the second half of his prima facie case, however, Vitug must put forth statistical evidence sufficient to show that Multistate's utilization of word-of-mouth recruitment and subjective interview evaluations directly result in a disproportionate failure to hire or promote Asian or Catholic applicants.

Vitug's evidence on this issue consists of the affidavits of two expert witnesses: (1) Neil Lane, a cancer statistician from The University of Chicago; and (2) Dr. Jane Halpert, an associate professor of psychology at DePaul University. Lane offers no statistics whatsoever comparing Multistate's hiring and promotion of Asians, Catholics, or other minorities for auditor or management positions with data from the industry as a whole—a comparison that would demonstrate whether Multistate's employment practices have a disproportionately negative effect on minority applicants for auditor or management positions. The Supreme Court has held that this type of statistical comparison "generally forms the proper basis for the initial inquiry in a disparate-impact case." *Wards Cove Packing,* 490 U.S. at 650–51, 109 S.Ct. at 2121. Yet, Lane essentially ignores the question of what statistical effect Multistate's employment practices have had on the number of minorities hired and promoted; he mentions Multistate's minority representation only once, stating: "Before August 1990, the average minority presence among auditors was only about 10 percent. This rate has improved since that time among auditors, but still remains low among management-level employees." Lane offers no statistics or data in support of this conclusory assertion.

Instead, the thrust of Lane's affidavit is that Multistate's hiring and promotion procedure constitutes a "mechanism" that lends itself to discrimination. Lane claims that under Multistate's interview procedure, the statistical correlation between the separate panelists' scorings of applicant responses is

low; that the correlation between the scores awarded to an applicant and the quality of an applicant's resume traits is low; and that there are various structural inconsistencies within the interview procedure. From this, Lane concludes that Multistate's interview process is a poor indicator of a candidate's ability.

Lane's conclusions, however, support only the inference that Multistate's selection process is subjective—at worst, that it is arbitrary and unreliable. But arbitrariness alone does not amount to discrimination. It is not enough for a plaintiff to demonstrate that an employment practice could theoretically be used to discriminate—Title VII does not forbid subjective selection processes. Under a disparate impact theory of discrimination, a plaintiff may successfully attack a subjective and arbitrary hiring procedure only if it has a disproportionately negative effect on members of a protected class. Put simply, success under a disparate impact theory of discrimination requires a showing of disparate impact. Absent such a showing, it is not the place of this court to judge the effectiveness or accuracy of a company's interview procedures.

Dr. Halpert's affidavit similarly makes no statistical comparison between Multistate's hiring or promotion of minorities and the hiring or representation of minorities in similar positions in the workforce. She does note that three of the six employees in Multistate's Chicago office are born-again Christians, but without a comparison to the number of Protestants in the industry as a whole, this observation has little probative value. Instead, Dr. Halpert, like Lane, touts the ineffectiveness of Multistate's selection procedures. She notes that due to its inherent unreliability and lack of validation from actual performance, Multistate's hiring process is well below professional standards. She criticizes its lack of structure, noting that the interview questions have no correct answers and that the scores are not standardized. From these observations, Dr. Halpert makes a fantastical leap to concluding that Multistate has a discriminatory preference for hiring and promoting born-again Christians, that Koenig is instrumental in furthering this pattern of discrimination, and that Koenig and the other interviewers discriminated against Vitug by virtue of his religion and national origin. These conclusory allegations, however, are completely unsubstantiated by any reasoning or statistical evidence. Like Lane, Dr. Halpert's observations prove nothing more than the subjective, perhaps even arbitrary, nature of Multistate's selection process. Thus, Vitug has failed to offer any meaningful evidence whatsoever to support his claim that Multistate's word-of-mouth hiring and subjective interview evaluations have a disproportionately negative impact on minority applicants.

The defendants, on the other hand, submitted the affidavit of Elisabeth Landes, a specialist in labor economics who is a senior economist and vice president of the consulting firm, Lexecon, Inc. Landes observed that Multistate had hired or promoted eighteen auditors since March 1988, when Multistate began to use the challenged interview procedure. Of those auditors hired, six (or 33 percent) were minorities, and four (or 22.2 percent) were Asians/Pacific Islanders. Landes compared these figures with the total percentage of minorities among accountants and auditors in the national workforce, 16.7 percent. Thus, Landes's data demonstrate that, contrary to what Vitug needed to prove, Multistate's challenged hiring practices actually have a favorable rather than a negative effect on minority applicants in general, and Asians/Pacific Islanders in particular.[3]

---

**3.** We also note that with respect to positions similar to the field audit supervisor position for which Vitug was rejected, Multistate has filled four management-level positions since March of 1988. Although this sample size is too small for any meaningful statistical comparison, it is notable that one of the four hires (or 25 percent) was George Fung, an Asian/Pacific Islander. Vitug wildly asserts that Multistate hired George Fung as a desperate attempt to hide its discriminatory practices in response to Vitug's grievance. However, Fung interviewed for the New York position, and was scored second highest by the panel, during the same week that Vitug interviewed for the Chicago position. Given that it was not until the next week that Vitug learned of his failure to attain the promotion and submitted his grievance, his claim that Fung was hired in response to his complaints is wholly without merit.

## 2. *Disparate treatment*

In order to establish a prima facie case of disparate treatment in a hiring or promotion decision context, the plaintiff must demonstrate (1) that he belonged to a protected class; (2) that he applied and was qualified for a particular position; (3) that he was not offered the position; and (4) that the position remained open to others after the plaintiff was rejected. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once the plaintiff has established his prima facie case, a presumption of discrimination is created, and the burden of production shifts to the defendants to present evidence of a legitimate, nondiscriminatory reason for their unfavorable treatment of the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). As with other rebuttable presumptions, although the burden of production is shifted to the defendants, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). If the defendants satisfy their burden and articulate a nondiscriminatory reason for their actions, the burden of production reverts back to the plaintiff and merges with his ultimate burden of persuading the factfinder that the defendants' proffered reason is pretextual and that he was actually the victim of intentionally discriminatory conduct. *St. Mary's Honor Ctr.*, 509 U.S. at 507–08, 113 S.Ct. at 2747–48.

With respect to plaintiff's prima facie case, both parties agree that Vitug, who is a Catholic and a Filipino, applied and was rejected for the position of field audit supervisor and that the position was instead offered to Jennings, a non-Filipino and born-again Christian. Although the parties dispute Vitug's qualification for the position, we must view all facts in the light most favorable to the nonmovant, and we therefore conclude that Vitug has established his prima facie case.

To rebut the plaintiff's prima facie case, the defendants have presented evidence that Vitug was not offered the field audit supervisor position because three separate interviewers unanimously considered him the least-qualified among six applicants interviewing for the job. The ultimate burden thus falls upon Vitug to prove that the defendants' explanation is merely pretextual and that Vitug was instead rejected for promotion because of his religion or his national origin.

To support this claim, Vitug again offers the affidavits of Lane and Dr. Halpert. As discussed above, however, the analyses of Vitug's expert witnesses demonstrate only that Multistate's interview process is subjective, and perhaps unreliable. But just as this was not evidence that the interview process had a disproportionately negative effect on members of Vitug's religious or ethnic group, it is also not evidence that Vitug was intentionally passed over for promotion simply because of his religion or national origin. Demonstrating that an interview process is influenced by subjective factors does not go any distance toward proving that Vitug's religion or national origin were among those subjective factors. Vitug admits that prior to being rejected for the field audit supervisor position, he never had any reason to suspect religious or ethnic bias against him at Multistate. Vitug has offered no evidence of any of the interviewers ever making a derogatory or insensitive remark concerning his religion or national origin. Neither has Vitug claimed that any of the interview questions were inappropriate. His claim is essentially that Koenig possessed the intent to discriminate against all but white, born-again Christians and that this discriminatory animus directly resulted in Vitug's failure to be promoted.

This claim fails first due to the paucity of evidence concerning Koenig's intent to discriminate against Vitug. Vitug can offer no evidence of Koenig ever making any derogatory or insensitive remarks concerning—or acting in a derisive manner toward—Vitug's religion or national origin. Instead, Vitug offers the testimony of two Multistate employees, John Clancy and Jerry Birk. In his

affidavit, Clancy explains that while working for the California Franchise Tax Board, he knew Les Koenig, who at that time worked in the same building at the Colorado Tax Board. Clancy claims that when a position became available at the Colorado Tax Board, Koenig made only minimal attempts to comply with EEOC notice requirements because Koenig said he did not want "certain" people from the California Franchise Tax Board applying for the job. Given that there were many minorities at the California Franchise Tax Board, Clancy interpreted this statement "to mean that Les Koenig did not want to hire minorities for the position." Clancy also recounts a time when Koenig stated, "I want to work with people I get along with." Clancy states that he "understood Les Koenig's desire to work with people he got along with as wanting to work only with whites." However, Clancy bases this interpretation on the fact that he knew Jennings once had personality differences with a minority supervisor. All in all, despite Clancy's broad "understandings," this testimony presents no evidence whatsoever indicating Koenig's sentiments with respect to minorities.

Ostensibly to demonstrate Koenig's discriminatory animus concerning those that are not born-again Christians, Vitug offers the deposition testimony of Jerry Birk. Birk testified that he was demoted for budgetary reasons and that he was put on probation by George Fung and Les Koenig when his productivity fell short of established goals. He further testified that several employees in Multistate's New York office, all of them Jewish, left their jobs or were disciplined supposedly because they failed to get along with George Fung. We are at a complete loss to understand how this testimony has any bearing at all on Koenig's treatment of members of differing religions.

Vitug's claim of disparate treatment also fails because he cannot demonstrate that Multistate's decision not to promote him was the result of his religion or national origin. With respect to word-of-mouth notification of positions, Vitug cannot complain of unfavorable treatment because he himself was notified of, and interviewed for, the field audit supervisor position.

Neither does the panel's decision to hire Jennings, a white Protestant, demonstrate that Vitug was rejected on the basis of his religion or ethnicity. The simple failure to hire a minority applicant does not, without more, constitute discrimination. Vitug points to Jennings's relationship with Koenig and the fact that both are white and members of the same church as evidence that he was rejected because he was Catholic and not white. However, if the only reason for Jennings' hire was his affiliation with—and racial and religious similarity to—Koenig, Vitug cannot explain why all three interviewers considered Jennings the most qualified applicant. In fact, the record indicates that Koenig awarded Jennings a lower numerical score than did the other two interviewers. Despite this, even if Jennings had not interviewed for the position at all, Vitug would still have been unanimously ranked fifth of five applicants by three interviewers who the same week selected George Fung, an Asian/Pacific Islander, for a similar position in Multistate's New York office. Vitug is left with only his naked assertion that he was the most qualified applicant, and therefore the panel's failure to hire him could have been due to nothing but discrimination. This court, however, cannot sit in review of an employer's appraisal of applicants' qualifications unless the plaintiff puts forth some tangible evidence to show that the employer's decisions were motivated by improper factors—a showing that Vitug has not made.

Thus, Vitug has offered no evidence whatsoever supporting his contention that Multistate's failure to select him for the field audit supervisor position violated Title VII, either under a disparate treatment or a disparate impact theory of discrimination. Accordingly, the district court's decision to grant summary judgment in favor of the defendants on Vitug's failure to promote claim was appropriate.

B. Vitug's Constructive Discharge Claim

Title VII provides, among other things, that an employer may not "discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Where a

defendant employer "makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation," the courts will consider the plaintiff employee to have been constructively discharged. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536–37 (7th Cir.1993) (quoting *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 426 (7th Cir.1989)) (emphasis in original). Through this legal construct, a plaintiff who is forced out by discriminatory conduct may bring a successful Title VII claim even though the plaintiff was never officially dismissed by the defendant. *Saxton*, 10 F.3d at 536–37.

 In order to recover under a constructive discharge theory of discrimination, the plaintiff must demonstrate first that he was, in fact, constructively discharged—i.e., that the defendant made the working conditions so intolerable as to force a reasonable employee to leave. *Id.* Once a plaintiff has shown that a constructive discharge occurred, he must prove, as with any other discharge claim under Title VII, that he was constructively discharged because of his membership in a protected class. *Id.*

 In his complaint, Vitug's claim of constructive discharge comprises a recounting of the circumstances surrounding his rejection for the field audit supervisor position and a declaration that the defendants' failure to promote him in the first place, together with the defendants subsequent refusal to remedy this failing, had "rendered the Plaintiff's working conditions intolerable, and Plaintiff was compelled to terminate his employment involuntarily...." This claim is consistent with plaintiff's letter of resignation, in which he stated: "The circumstances surrounding the denial of my promotion to Field Audit Supervisor has [sic] created a hostile work environment."

Thus, from the pleadings, Vitug's constructive dismissal claim rests entirely on the assertion that Multistate's failure to promote him constituted discrimination on the basis of his religion and national origin—an assertion that, as explained above, Vitug has offered no evidence to support. Nevertheless, in his argument against summary judgment (echoed on appeal), Vitug alleges that defendants'

conduct between his denial of promotion and his resignation also forced him to leave Multistate.

Vitug admits that prior to June of 1991, Koenig's reviews of Vitug had always been favorable, and Vitug had never been mistreated. Yet, according to Vitug, after he was passed over for the position of field audit supervisor and Jennings assumed a supervisory position over him, working conditions at Multistate deteriorated into a hostile and intolerable environment. As the district court succinctly summarized:

> Vitug claims: (1) Koenig and Jennings were "confrontational" and "overly aggressive"; (2) Jennings would give "threatening looks" when Vitug conversed with other auditor[s], and "tried to intimidate" other auditors into not seeking advice from Vitug; (3) other auditors eventually stopped interacting with Vitug; (4) Koenig gave Vitug the "silent treatment," or was arrogant and hostile; (5) Vitug was excluded from meetings of the auditors; (6) Jennings criticized Vitug's method of performing audits, and stated his dissatisfaction with the amount of time they took and Vitug's lack of aggressiveness in obtaining information from taxpayers; and (7) Koenig and Jennings demanded that Vitug sign a performance goal, and argued with him when he refused to sign.

*Vitug v. Multistate Tax Comm'n*, 860 F.Supp. 546, 553 (N.D.Ill.1994). What is important, however, is that Vitug never claims that Koenig, Jennings, or anyone else at Multistate ever made any disparaging remarks concerning his religion or national origin. Nor does Vitug present evidence that any of the above hostile treatment was a result of Vitug's religion, national origin, or his filing a claim with the EEOC. Thus, regardless of how horrific the conditions Vitug describes may have been, Vitug has failed to put forth any evidence supporting his claim that Multistate's failure to promote him, or Koenig's and Jennings's ensuing incivilities, were a result of his religion or national origin. Because Vitug cannot prove that any of defendants' actions were motivated by his religion or ethnicity, his constructive discharge claim is doomed to failure even if he

were able to demonstrate that the working conditions at Multistate were intolerable.

The district court's entry of summary judgment in favor of the defendants on all counts is AFFIRMED.