**Kathleen S. LOCKE, Plaintiff,**

v.

**GAS RESEARCH INSTITUTE, Defendant.**

**No. 94 C 5241.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 6, 1996.

Paul George O'Toole, Reibman, Hoffman & Baum, Chicago, IL, Donald G. Weiland, Chicago, IL, for plaintiff.

Ralph Andrew Morris, Wendy L. Nutt, Brittain, Sledz, Morris & Slovak, Chicago, IL, for defendant.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is Defendant Gas Research Institute's ("GSI") Motion for Summary Judgment against Plaintiff Kathleen S. Locke ("Locke"). For the following reasons, the motion is granted.

### I. Background [1]

Locke's Complaint includes various theories of recovery: age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a); gender discrimination under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e–2; and violation of the Equal Pay Act of 1963 ("Equal Pay Act") 29 U.S.C. § 206(d). Essentially, Locke complains that GRI failed to promote her because of her age and gender, retaliated against her via constructive discharge for filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and paid female employees less than similarly-situated male employees.

Locke is female and was approximately sixty-three years of age at the time of the alleged discrimination. She holds a Bachelor of Arts degree in zoology, with a minor in chemistry, from the University of Vermont. She has taken graduate courses in various disciplines but has not completed an advanced degree. She performed laboratory research for Harvard University, and library technical research for Eastman Kodak Company in the field of toxicology and industrial hygiene.

GRI hired Locke in July 1980, when she was fifty years of age. Locke resigned from GRI in September 1993. During Locke's employment with GRI, GRI's research and development functions were organized by de-

---

1. The following undisputed facts are taken from the parties' Local General Rule 12(M) and 12(N) Statements of Material Fact.

partments, each devoted to a specific discipline and headed by a director. Within each department are various project managers; the project manager positions vary greatly from department to department, each having unique qualifications, duties, and responsibilities.

GRI hired Locke as a research scientist in the Basic Research Department. Locke was satisfied with her treatment by GRI in this position. Her starting salary was $25,000.

During Locke's employment with GRI, salary adjustments occurred on a yearly basis, with department directors apportioning adjustments within their respective departments. Locke received salary increases at relatively regular intervals throughout her employment with GRI.

In September 1981, Locke received a promotion to Project Manager, Biochemistry, in the Basic Research Department, and her salary increased to $31,300. Locke held this project manager position for five years. She was satisfied with her treatment by GRI until the end of her tenure in this position.

In January 1986, GRI transferred Locke laterally to the position of Planning and Evaluation Specialist in its planning department as part of a reorganization at GRI. Locke's title became "Planning Specialist" in April 1986. As a planning specialist, Locke initially reported to Myron Gottlieb and then to Joseph Hilyard ("Hilyard"), both males. In this position, Locke's salary continued to increase, reaching $47,400 in September 1988.

In April 1989, Locke contacted William Burnett ("Burnett"), Vice President of GRI, and verbally requested a transfer out of the planning department. She requested the transfer because of conflicts with Hilyard, and because she did not enjoy the type of work she did in that department. Locke stated that she wished to return to a project manager position.

Locke interviewed for an open project manager position in the Environment and Safety Research Department; in July 1989 she entered the position of Project Manager, Air Quality, in that department. Prior to the transfer, Locke had no educational or voca-

tional experience with air quality. After the transfer, she attended some short seminars on air quality issues. This was a lateral transfer, and Locke did not receive a salary increase.

In the air quality position, Locke reported to Howard Reiquam ("Reiquam"), Director of Environment and Safety Research. Locke was dissatisfied with Reiquam's supervision because he was not accessible for assistance as she would have liked. However, she stated that he always treated her in a fair manner.

During Spring 1990, and for the next eighteen months Locke reported to Leslie Donaldson ("Donaldson"), a male, who was acting as a Manager of Environment and Safety Research as part of a rotation through the various departments at GRI. Donaldson reported to Reiquam. Locke felt that Donaldson was a fair supervisor. Locke testified that she agreed with an April 1991 performance appraisal by Donaldson. Among various compliments to Locke's work, the appraisal states that Locke needed to continue developing her technical background, and that she needed to "strengthen her coordination activities with industry, regulatory agencies, and compressor station vendors." Further, the appraisal states that Locke needed continued coaching in budget and program planning activities. The appraisal also states that Locke needed to improve her confidence and initiative.

While she held the air quality position, Locke worked with Irvin Billick ("Billick") for approximately eight months on various projects, though she continued to report to Reiquam. GRI assigned Locke to work with Billick to provide her with technical training and guidance. However, Locke had difficulty working with Billick. Specifically, she states that Billick excluded her from meetings with contractors and that contractors perceived her as Billick's technical secretary. After a discussion between Locke, Billick, and Reiquam, Locke was no longer required to work with Billick. Locke also generally states that she was not invited to various meetings when she was project manager until she "took the matter up" with Donaldson

and Reiquam. By September 1992, Locke's salary had increased to $52,200.

In April 1991, GRI promoted Patricia Duggan ("Duggan") to the position of Project Manager, Environment and Safety Research, at a salary of $48,600. Duggan was born in 1959. Duggan's salary increased to $51,600 in September 1991. In September 1992, there was one male project manager in the Environment and Safety Research Department, Thomas C. Green ("Green"), who was born in 1952. Greene's salary was $47,300.

In November 1991, Locke applied for a senior project manager position, which was posted on GRI's electronic bulletin board. The position required a Bachelor of Science degree in engineering or science, and knowledge of air quality and environmental issues (particularly with regard to the gas industry). Reiquam generally initiated promotions in the Environment and Safety Research Department by recommending persons in the department to GRI's Human Resource Department and GRI's vice presidents for approval. Promotion decisions are generally made during yearly evaluations in the summer, and become effective in the fall. Locke discussed her application with Reiquam. Locke states that Reiquam indicated to her that it was likely she would be promoted in the "normal cycle." Locke understood this to mean that she would be promoted in the following September. However, Reiquam made no specific promise of promotion nor did the two discuss a specific date.

Locke was not promoted in September 1992. She questioned Reiquam regarding the denial of the promotion. Although Reiquam said that he understood her disappointment, he stated that he chose not to recommend her for promotion at that time because he did not feel that she was technically qualified for the position. Locke states that her curriculum vitae refutes Reiquam's statement that she lacked the requisite technical background; Locke testified that she met the posted requirements for the senior project manager job, but that she did not meet the different requirements added by Reiquam.

The position for which Locke applied was withdrawn from the electronic bulletin board in September 1992, with no person being hired into or promoted to the position. When Locke contacted the Human Resources Department, she was told that the position had been eliminated and that it would not be filled.

Locke filed a complaint with the EEOC in November 1992. Locke complains that Reiquam added his own requirements to the job listing for which Locke applied only after she complained to the EEOC. However, she admits that the listing was removed from the electronic bulletin board in September 1992, and that she did not file her charge until November 1992.

Subsequently, GRI transferred Donaldson out of Locke's department, and she began reporting to Ronald Isaacson ("Isaacson"). Locke had limited interaction with Isaacson. In December 1992, Isaacson passed by Locke's office several times; Locke concluded that Isaacson was "checking up" on her. Locke closed her door after one week and has no knowledge that Isaacson checked up on her again. She also states that she was "later" reprimanded for closing her door.

In December 1992, Locke had a dispute with a secretary over the secretary's failure to make travel arrangements for Locke. Locke was reprimanded for her harsh treatment of the secretary; no other action was taken against Locke regarding the incident. Locke states that she was "not allowed to explain her side of the dispute, and it was blown out of proportion."

Locke states that her work area was much smaller than her co-workers' work areas, and that she asked to be assigned to a larger space. She was eventually given a larger space.

In June 1993, Isaacson resigned his position with GRI. Before his resignation, Isaacson completed what GRI characterizes as an "analysis," and Locke characterizes as "observations including personal derogatory criticism," of Locke ("Memo"). The Memo included several criticisms of Locke's performance. Locke received a copy of the Memo in a meeting between herself and Thomas LaForce, GRI's Human Resources Group Manager, and Lynn Henrickson, Senior Hu-

man Resources Specialist in June 1993. Locke stated her position, that she disagreed with the Memo, and no disciplinary or other employment action was taken against her at any time. The parties dispute whether, at that time, Locke agreed with the factual basis of the Memo.

Locke states that in July 1993, she received a telephone call from Joan Kramer ("Kramer"), a secretary with GRI, who told Locke that GRI was eliminating five positions. Locke states that, in response to Locke's questions about whether Locke's name was on the list of eliminations, Kramer did not answer; Locke took this to mean that her position was to be terminated. Although Kramer's recollection is disputed by Locke, Kramer states that she may have spoken with Locke regarding Kramer's own transfer at GRI, but Kramer denies that she knew of any planned job eliminations at GRI. Therefore, Kramer denies that she discussed the topic of job eliminations with Locke.

In July 1993, Locke submitted a letter of retirement to GRI. Locke decided to retire because she believed that she was going to be fired, based on the Memo, the meeting with Human Resources, and Kramer's phone call. Locke thought that this firing would cause her to lose her health insurance. Locke says that she reviewed the benefits manual, which did not spell out whether benefits would continue for a fired employee. Although Locke states that the GRI benefit literature led her to believe that she would lose her benefits if fired, Locke does not deny that, as stated by GRI, employees who were at least age fifty-five with ten years service were eligible for retiree medical benefits upon termination, regardless of whether they are fired; as such, she does not deny that she would have been eligible for continuing benefits if she had been fired.[2] Locke has extensive medical problems (high blood pressure, diabetes, and hypothyroidism) which would have made obtaining new bene-

fits difficult and expensive. She understood that benefits under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") would be available for a limited time.

GRI states that it did not plan to fire Locke, and that Locke would not have been terminated had she not chosen to retire. GRI denies that Locke's position was to be eliminated and says that only two positions, both in other departments, were eliminated. Locke states that her position was eliminated and combined with that of Isaacson; GRI admits that Locke's duties were combined with Isaacson's, but denies that this would have occurred had Locke not retired.

Locke filed an amended charge of discrimination with the EEOC in January 1994. Reiquam resigned from GRI in October 1993, and died in March 1994.

GRI has filed for summary judgment, arguing the following: that its decision not to promote Locke was based on legitimate, non-discriminatory reasons; that it took no adverse action against Locke because of her filing with the EEOC; and that Locke has presented no evidence that it violated the Equal Pay Act.

## II. *Discussion*[3]

Viewing all proffered evidence in the light most favorable to Locke, the court has struggled to locate even a gleam of evidence that Locke suffered because of her age and/or her sex. Alas, the search has been to no avail.

 To defeat a motion for summary judgment, the non-movant cannot rest on the pleadings alone, but must marshal evidentiary facts sufficient to raise a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adler v. Glickman,* 87 F.3d 956, 957 (7th Cir.1996). The non-movant must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

---

**2.** The court notes that all statements appearing in a 12(M) statement which remain uncontroverted shall be deemed admitted. Local Rule 12(N)(3)(b).

**3.** The court notes the disjunctive nature of Locke's submissions for this motion. They out-

line various facts without reference to the relevance of those facts, and often fail to apply those facts to current and authoritative law in a comprehensible fashion. Still, the court has taken great care to make the most of the information offered.

*Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (*cited in Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 840 (7th Cir.1996)). It is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.1988).

■ Still, summary judgment shall be rendered only where the pleadings, depositions, and admissions of record, together with any affidavits, demonstrate there is, indeed, no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Motions for summary judgment in employment discrimination cases "must be decided with particular care, given the extent to which the merits often turn on questions of credibility and intent." *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 893 (7th Cir.1996).

## A. ADEA and Title VII

■ Locke claims that GRI discriminated against her by not promoting her to the position of senior project manager. In employment discrimination cases, the central question is whether the employer would have engaged in the same conduct if the same employee were of a different sex, or age, or race, or religion, or national origin, or other protected class. *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996). Plaintiffs may establish discrimination itself (as opposed to retaliation for filing a discrimination claim) either by presenting direct evidence, or by employing the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Rabinovitz v. Pena,* 89

F.3d 482, 485 (7th Cir.1996). Locke has presented absolutely no direct ("smoking gun") evidence of either age or sex discrimination. Therefore, the court must proceed to the burden-shifting analysis.

■ The first step in this analysis requires the court to determine whether Locke has presented a prima facie case of age and sex discrimination. Once established, a prima facie case gives rise to the rebuttable presumption of discrimination, and the employer must assume the burden of producing (not proving) a legitimate, non-discriminatory reason for its rejection of the plaintiff-employee. *Rabinovitz,* 89 F.3d at 487. "[F]or a reason to be 'legitimate,' in the sense of sufficient to rebut a prima facie case, it need not be a good or sympathetic justification for what the employer did; it need only be non-discriminatory and ... explain why the challenged action was taken." *Timm v. Mead Corp.,* 32 F.3d 273, 275 (7th Cir.1994) (*quoted in Mills,* 83 F.3d at 845).

■ Once an employer articulates a legitimate, non-discriminatory reason for the rejection, the burden shifts once again to the plaintiff-employee to prove that the employer's proffered reason was merely pretextual. *Adler v. Glickman,* 87 F.3d 956, 959 (7th Cir.1996). Thus, the ultimate burden of persuasion remains always with the employee. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 515 (7th Cir.1996) (citation omitted).

### i. Failure to promote because of age or sex

■ The elements of a prima facie case in the promotion decision context are (1) that she belonged to a protected class (over forty for purposes of her ADEA claim and female for purposes of her Title VII claim), (2) that she applied for and was qualified for a specific position, (3) that she did not receive the position, and (4)[4] that the position remained

---

**4.** Respectfully, the court notes the conflict in recent case law from the United States Court of Appeals, Seventh Circuit, regarding the fourth element of a prima facie discrimination case. *See Mills,* 83 F.3d at 843 n. 6. *See also Rabinovitz,* 89 F.3d at 486 (citing *Sample v. Aldi, Inc.,* 61 F.3d 544, 548 (7th Cir.1995) and defining the fourth element as "(4) someone younger ... was

given the position (age discrimination) or someone of a different ... [sex] was given the position ( ... [sex] discrimination).''). *But see also Carson,* 82 F.3d at 158 (stating that, after *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), a plaintiff may establish a prima facie case of discrimination without regard to her replacement's char-

open to others after she was rejected. *Vitug*, 88 F.3d at 515.[5] Locke established the first element, in that she is a female over forty years of age. She has also established the third element, in that she has established that she did not receive one promotion.

■■■ However, the parties dispute whether Locke was qualified for the position for which she applied, and the court has not been given anything of evidentiary quality to prove that she was. GRI submitted performance appraisals of Locke which include various criticisms of Locke's level of training and her competence. Although Locke generally contends that these appraisals were negative because of her age and gender, she has produced absolutely no evidence which could lead to this inference. "An employee's self-serving statements about ... [her] ability ... are insufficient to contradict an employer's negative assessment of that ability." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir.1994). Thus, Locke has not established the second element of her prima facie case.

■■■ Locke has also not established that the senior project manager position remained open after she was rejected. Had Locke been promoted in the ordinary course of events, she would have been promoted in September 1992. She was not. She admits that the job listing was removed from the electronic bulletin board in September 1992. Although the court does not know the specific date on which Locke's "rejection" was official, or the specific date on which the listing was removed, certainly the removal did not occur long after Locke's rejection. Thus, Locke has not established the fourth element of the *Vitug* prima facie case.

Still, giving Locke more than the benefit of the doubt, the court will assume *arguendo* that Locke has established a prima facie case of discrimination. Thus, GRI must produce a legitimate non-discriminatory reason for its conduct.

■■■ GRI states that it did not promote Locke because she was not qualified for the senior project manager position. The position required twelve years of experience and a technical degree. Locke admitted that she did not meet the job requirements as defined by the head of the department, Reiquam. Although Locke states that she had worked for GRI for twelve years and had some graduate credits, GRI states that she did not have twelve years experience in air quality work, and that she did not hold any advanced degree, much less a related degree. Further, Locke's supervisors determined that she was not qualified because she lacked the requisite skills, knowledge and autonomy necessary for the position. In addition, GRI chose to eliminate the posted position; Locke could not be placed in an eliminated position.

Locke produces no evidence whatsoever which leads to the inference that GRI's purported reasons for its conduct are pretextual

---

acteristics, and finding *Sample* not authoritative regarding the fourth prong of a prima facie case). *See also O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310 (citations omitted) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant.... [T]he proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion....'"). The court notes that, if plaintiffs are required to show for their prima facie cases only that they are members of protected classes and that they suffered adverse employment actions, employers will be forced to defend to summary judgment even the most frivolous of cases. Yet, as the court finds the rule set forth in *Vitug* most appropriate for purposes of the instant case, it need not determine wheth-

er Locke must show that she was replaced by a younger male for purposes of her prima facie discrimination case.

5. It is unclear whether Locke attempts to proceed under a reduction-in-force theory, as she simply alleges failure to promote to an eventually-eliminated position, rather than that her position was eliminated. In reduction-in-force cases, where employers eliminate a position, the fourth element is a requirement of some logical, but discriminatory, connection between an employer's decision to retain other similarly situated employees and not to retain the plaintiff. *See Chiaramonte v. Fashion Bed Group, Inc.*, 932 F.Supp. 1080, 1086–87 (N.D.Ill.1996). Still, Locke has not even pleaded that any one similarly situated received a promotion, much less a logical connection between GRI's choice to promote another employee and not to promote Locke.

and that she was rejected because her age or sex. She does not present evidence of any disparaging remarks concerning her age or sex. She does even allege, much less demonstrate, hostile treatment which is in any way linked to her age or sex. Thus, she has not demonstrated that GRI's stated reasons for denying her promotion were pretextual. As such, no reasonable jury could find in her favor.

### ii. Constructive discharge because of age or sex

 Locke argues that she was constructively discharged because of her age and sex. Recovery under a theory of constructive discharge requires a prima facie showing that the employer made working conditions so intolerable that a reasonable employee would be compelled to leave, and that it did so because of her membership in a protected class. *Vitug*, 88 F.3d at 516 (citation omitted). Even if a reasonable jury could find that Locke was compelled to leave GRI, for the reasons discussed above, no reasonable jury could find that she was compelled to leave because of her age or sex. Because Locke cannot establish that any of GRI's actions were motivated by her age or sex, her constructive discharge allegations would be doomed to failure even if she could prove that the working conditions at GRI were intolerable. *See Vitug*, 88 F.3d at 517.

### iii. Retaliation for EEOC filing

Locke claims that GRI retaliated against her for filing with the EEOC by constructively discharging her. The retaliation claim revolves around few facts: Isaacson "checking up" on her, the reprimand regarding her secretary, the Kramer telephone call, and her incorrect understanding that she would lose her benefits if fired.[6]

 To establish prima facie claims for retaliation, employees must show (1) that they engaged in statutorily protected activity, (2) that they suffered adverse employment action, and (3) that there is a causal link between the protected activity and the adverse action. *Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993). The parties do not dispute that Locke's filing with the EEOC constitutes protected activity. They do, however, dispute the other elements of Locke's retaliation claim.

 Locke argues that the adverse action she suffered was her constructive discharge. Again, to prevail under a constructive discharge theory, Locke must show a workplace which became so intolerable that a reasonable person would be forced to leave, and that the workplace became so intolerable because of her EEOC complaint. *See Rabinovitz*, 89 F.3d at 487 (citation omitted). The working conditions must be more than intolerable, they must be intolerable in a discriminatory way. *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994). "An employee may not be unreasonably sensitive to ... [her] working environment" and must seek redress while remaining on the job. *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989) (*quoted in Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994)). "[A]n employee must seek legal redress while remaining in ... her job unless confronted with an 'aggravated situation' beyond 'ordinary' discrimination." *Darnell*, 16 F.3d at 177.

Regarding her working environment, Locke stated that the atmosphere at GRI was "difficult" and "stressful" after she filed the EEOC charge. However, when asked to identify specific difficult and stressful experiences, Locke spoke only of the "checking up" and the reprimand for her harsh treatment of her secretary.[7] Locke did not actually

---

**6.** Locke also noted that her work space was smaller than that of her co-workers. However, Locke has failed to share the implications of her small work space with the court: she does not state that younger, or male, employees had larger work spaces; she does not state that she received the smaller space after her EEOC claim. The court is not about to venture into analysis of the wisdom of GRI's office-space planning (*see Rabinovitz*, 89 F.3d at 487 (citation omitted) (reiterat-

ing that courts do not sit as super-personnel departments reexamining entities' business decisions)).

**7.** Although Locke also argues that the failure to promote her contributed to this environment, the failure to promote cannot be considered for purposes of EEOC discrimination, as it occurred prior to her EEOC charge.

resign until six months after she filed her EEOC charge.

■ It is true that a temporal connection between an employee's protected activity and an employer's adverse action is generally enough to establish a prima facie connection between the adverse action and the protected activity. *See, e.g., Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir. 1989) (citation omitted). The conduct Locke complains of occurred after her EEOC filing.

■ Locke thought that she would be fired (perhaps for discriminatory reasons) and did not want to lose her benefits, so she retired. GRI states that she would not have been fired; and Locke has admitted that, even if she had been fired, she would not have lost her benefits. The court is not prepared to hold that the mere suspicion of future discriminatory conduct can create a work environment so unbearable that a reasonable person would resign to keep benefits without first ascertaining whether those benefits would actually be lost. Undocumented and amorphous fear of actionable discrimination is not enough for constructive discharge.

■ Even looking at Locke's contentions in conjunction with all evidence in this case, and in the light most favorable to Locke, they can not establish working conditions so difficult that a reasonable person would feel compelled to resign, or that the conditions were difficult because of her EEOC charge. At most, Locke has alleged a few, isolated moments of retaliation without aggravation. This is not enough to establish that she was constructively discharged. A reasonable person would have remained on the job while seeking redress for her alleged suffering. Accordingly, Locke suffered no actionable adverse retaliatory employment action and cannot establish retaliation for her EEOC filing under a theory of constructive discharge.

### B. Equal Pay Act

■ GRI asserts that Locke cannot support her Equal Pay Act claim. The court agrees. In order to set forth a prima facie

case under the Equal Pay Act, Locke must establish that GRI paid different wages to male and female employees who held substantially the same job positions. In other words, she must show that (1) GRI "paid different wages to employees of opposite sexes (2) for equal work requiring equal skill, effort, and responsibility, and (3) the employees worked under similar working conditions." *Young v. Meystel,* No. 95 C 2548, 1996 WL 385339, at *2 (N.D.Ill. July 3, 1996) (citation omitted). *See also Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 338 (7th Cir.1993). Locke has in no way produced any evidence which could establish this prima facie case.

■ To survive summary judgment, Locke must meet the threshold requirement of showing a substantial similarity between her job and jobs which she claims are equivalent. *Edmondson v. Simon,* 497 F.Supp. 411 (N.D.Ill.1980). To determine whether positions are substantially the same for purposes of Equal Pay Act analysis, courts may reference actual job performance and content. *Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543, 548 (7th Cir.1991). Locke must separately demonstrate each element of the equal work standard—equal skill, effort, and responsibility must each be shown. *See* 29 C.F.R. § 1620.14(a). Failure to show even one of these elements is fatal.

■ Locke has not identified any positions which she considers substantially the same as hers. The only person she identifies as earning more than her is Duggan in September 1991; however, she does not state that Duggan performed substantially the same work. She has a "feeling" that another project manager once told her that the "going rate" for project managers was $60,000 when she was making $52,000. However, Locke admitted that various project managers had different duties, responsibilities, and qualifications. She also testified to seeing a copy of wage increase records from 1983 which made it clear to her that men who were hired after her were making more money for the same work.[8] The only specifically

---

**8.** Locke submits a list of salaries, dated September 1983, which shows that various project managers earned different salaries. However, the list does not show the sex of the various managers.

male salary appearing in the evidence is that of Green, who earned $4,900 less than Locke. Locke does not identify anyone, male or female, who she claims was equally skilled, put forth equal work, or had equal responsibility, much less a male who was paid more than Locke or any other woman at GRI.

Locke's suspicion that she earned less than men in substantially the same position is inadequate to support an Equal Pay Act claim past summary judgment. "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). Locke produced no reliable evidence of unequal pay. As such, the court must grant summary judgment in favor of GRI on Locke's Equal Pay Act claim.

### III. *Conclusion*

Although Locke may have been dissatisfied with her position, she has in no way linked her dissatisfaction to animus resulting from her age or sex. For the foregoing reasons, GRI's motion for summary judgment is granted.

IT IS SO ORDERED.

As such, this list is not probative of Locke's Equal Pay Act claim. Further, the court questions the relevance of a 1983 salary list to Locke's 1995 claim.