52 F.3d 329
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Shirley Ann WHITE, Plaintiff-Appellant,
v.
The DIAL CORPORATION, Defendant-Appellee.
 No. 94-2448.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 22, 1995.
Decided April 6, 1995.
 
 Before EASTERBROOK, RIPPLE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Shirley Ann White sued her employer, the Dial Corporation, contending that she had been subjected to sexual discrimination in the form of a hostile working environment that forced her to transfer to another position within the company offering inferior pay opportunities.[1] The district court entered summary judgment in favor of Dial, from which White appeals. Our review is of course de novo. Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir.1994). Because we conclude that the record was insufficient to establish that White was "constructively transferred" from her former position, we agree that summary judgment in favor of the defendant was required.
 
 I.
 
 2
 White has worked at Dial's plant in Montgomery, Illinois for just over twenty years. During the majority of her employment at Dial, White has worked in the Soap Finishing Department. However, for a period of about ten weeks in 1989, White worked in the Chemical Processing Department. It is White's brief tenure in this department that gave rise to this suit.
 
 
 3
 White successfully bid for the job of Process Material Handler or "A-5 Operator" in January 1989 and began work in Chemical Processing the following month. The principal duties of an A-5 Operator include unloading raw materials from railroad cars, pretreating them, and storing them for processing. We are told this is considered a "plum" position among Dial employees: the pay is superior to most other jobs within the plant and A-5 operators enjoy greater opportunities for advancement.
 
 
 4
 Throughout most of her tenure as an A-5 operator, White was the sole woman to hold the position. She alleges, in fact, that her supervisors and co-workers in Chemical Processing were averse to women in that job, and that their hostility manifested itself in the following discriminatory practices:
 
 
 5
 1) White was denied salary increases reflecting the knowledge and skills she acquired with training;
 
 
 6
 2) supervisors and fellow workers commented repeatedly that the A-5 position was "not a woman's job";
 
 
 7
 3) she was given inadequate safety instruction;
 
 
 8
 4) she was berated and cursed by her co-workers, despite their knowledge that she is deeply religious;
 
 
 9
 5) she was denied breaks during her eight-hour shifts that her male co-workers were permitted to take;
 
 
 10
 6) she was not, unlike males, permitted to work overtime; and
 
 
 11
 7) she was followed and monitored by her supervisors to a degree that men were not.
 
 
 12
 Ultimately, White decided to transfer back to the Soap Finishing Department, effective April 17, 1989. When she resumed work in Soap Finishing, White appears to have earned an hourly wage higher than her compensation as an A-5 trainee. However, had she completed that training and remained in Chemical training, her base pay as an A-5 operator would have been greater than her base pay in Soap Finishing.[2]
 
 II.
 
 13
 Dial did not order White transferred from the Chemical Process Department to the Soap Finishing Department; she did so on her own. When a plaintiff has elected to resign from employment with the defendant, she normally cannot obtain reinstatement and back pay (the two remedies that White seeks[3]) unless she succeeds in proving that she was constructively discharged--that is, that her employer made her working conditions so intolerable that a reasonable person would have felt she had no real choice but to quit. Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir.), cert. denied, 115 S.Ct. 1512 (1994); Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 536-37 (7th Cir.1993); see also, e.g., Landgraf v. USI Film Prod., Inc., 968 F.2d 427, 429 (5th Cir.1992), aff'd on other grounds, 114 S.Ct. 1483 (1994); Maney v. Brinkley Mun. Waterworks & Sewer Dep't, 802 F.2d 1073, 1075 (8th Cir.1986).[4] Whether an employee can secure reinstatement and backpay by showing that she was constructively transferred is a question we have not previously decided, but for present purposes we shall assume that the answer is yes. Even so, our review of the record[5] leads us to conclude that a reasonable factfinder could not find that White's working conditions were so intolerable as to force a reasonable person to quit or transfer.[6] On that basis alone, we believe the district court was correct to enter summary judgment in favor of Dial.
 
 
 14
 White's underlying theory of Title VII theory is that of the hostile work environment, defined as a "workplace [which] is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Harris v. Forklift Sys., Inc., 114 S.Ct. 367, 370 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2405 (1986)). Circumstances that might be adequate to establish a hostile working environment for purposes of Title VII will not necessarily suffice to establish a constructive discharge. Landgraf, 968 F.2d at 430; Miller v. Illinois, 681 F.Supp. 538, 544 (N.D.Ill.1988). Conduct that detracts from an individual's work performance, hinders her advancement, or discourages her from remaining on the job can suffice to establish a hostile environment, Harris, 114 S.Ct. at 370-71; but in order to establish a constructive discharge, the severity or pervasiveness of the abuse must be so great as to compel the reasonable person to resign. Saxton, 10 F.3d at 536-37.
 
 
 15
 The district court found the record wanting in support even for a claim of hostile environment, and we share many of its reservations. In a number of instances, White has proffered evidence that she may have been treated unfairly, but the evidence does not necessarily suggest that she was so treated based on her gender. For example, one of White's principal claims is that she was denied interim pay raises based on the skills she acquired as an A-5 trainee. Dial had a written guide outlining the raises A-5 trainees were to receive based on the acquisition of particular skills (R. 68, Def.Ex. B at 51); other employees did receive such raises (id. at 136-150); and, according to White, one of her superiors acknowledged that she should have been given an interim raise (White Tr. 149, 249, 413, 415). Yet, at least two male A-5 operators testified that they did not receive raises until they completed their training and were proficient in all aspects of the job (Martinez Tr. 18, Beach Tr. 23), a point that White never reached (see White Tr. 253, acknowledging that she had not yet been trained to operate centrifuge). Indeed, one of them noted resentment among A-5 operators about the fact that other employees (both male and female) were qualified for pay raises far more quickly than they had been. Beach Tr. 21, 64. Consequently, there is no direct basis, at least, for inferring that White was denied interim raises because of her gender.
 
 
 16
 White also contends that she was denied work breaks, and at her deposition, she recounted a statement purportedly made by supervisor Don Huber to the effect that the A-5 operator position was an eight-hour job that did not permit breaks. White Tr. 64, 66. White also recalls co-worker and trainer Juan Martinez admonishing her on her first day as an A-5 trainee not to take a break, although he later seems to have relented and told her she could take a break when the task he assigned her was completed. White Tr. 63. White concedes that she was able to take a 30-minute break when she worked the 8 a.m. to 4 p.m. shift, but contends that she never was permitted to take "full" breaks or to take breaks at her own discretion. White Tr. 74. But it is not clear that she was singled out as a woman in this respect. Carl Cox testified that breaks did sometimes require supervisor approval and were contingent on the nature of the work an employee was performing. Cox Tr. 23. John Stathis confirmed that the A-5 job was a relatively demanding job that was not amenable to regular breaks, and he appeared to suggest that A-5 operators had to take their breaks at their own peril. See Stathis Tr. 38, see also Huber Tr. vol. II at 51-57.
 
 
 17
 White also contends that she was excessively supervised, to the extent that supervisor Huber even followed her to the restroom (although not into it), or was waiting for her outside when she emerged, on a number of occasions. White Tr. 76-82, 301, 357-58. Huber acknowledged that he monitored employees under his supervision closely, and he appears to have acknowledged that he might inadvertently have followed an employee who happened to be on his or her way to the bathroom. Huber Tr. vol. II at 31, 32-33. But whether he hovered about White in particular is uncertain. White's counsel did not explore this subject with her co-workers, and none of them volunteered information as to whether Huber followed them to the same extent he did White. Thus, we are again left without a basis for inferring that White was singled out as a woman.
 
 
 18
 White's evidence is stronger insofar as it concerns gender-based comments made to her during her tenure as an A-5 operator. On her first day of work in Chemical Processing, White recalled, co-worker Juan Martinez asked, "Why did you bid out here? This is really a dirty job. This is not a job for a woman." White Tr. 55. Martinez purportedly made similar observations about the A-5 Operator position not being a "woman's job" on other occasions (White Tr. 110, 405-07), as did co-worker Lorenzo Beach (Beach Tr. 43-44, as quoted in Opening Br. at 17). Dan Huber purportedly made these same types of remarks. According to White, Huber gave her a "safety talk" on her first day during which he too warned her that the A-5 job was cold and dirty (White Tr. 167); "[h]e stressed that it's not a woman's job because there hadn't been [any] women[ ] out there that stayed" (White Tr. 168).[7] On another occasion, after Huber learned that White had complained to management about not being given breaks and not being permitted to speak to a security guard following an accident, Huber allegedly cursed at White and told her, " 'You don't do that. You don't never go to my supervisor and tell them nothing. You just--Stupid women come out here in this department trying to take over.' " White Tr. 107-08. According to White, he went on: " '[Y]ou stupid, these stupid women trying to come out here and take men's jobs, stirring up a whole lot of'--blank--'troubles'. He was really upset. 'You should be in Soap Finishing with the women.' " White Tr. 109. White indicated that Huber repeated these remanks on another occasion, after she had spoken to Dan Ferrario. White Tr. 314. In yet another incident, after White had again gone to Huber's superiors concerning her failure to receive interim pay increases, Huber "hit the ceiling." White Tr. 413-14. "He was cursing and swearing and --'cause I had gone to his supervisor over him to tell him about the raise. 'You don't go to nobody else. You think this is not--I'm not doing what I'm supposed to do, then you go back where the women[ ] [are] at, at [S]oap [F]inishing." White Tr. 414. White believed that Huber made similar comments in other instances, although she could not recall the details. White Tr. 169-70.[8] White recounted another incident in which John Stathis, upset upon discovering that White had not completed a task he had assigned to her, told her to "[c]arry your broom back to Soap Finishing. This is not a woman's job." White Tr. 206; see also id. at 210-11. Stathis acknowledged that he "may have" expressed his opinion about women as A-5 operators, but said he couldn't recall having done so. Stathis Tr. 33.
 
 
 19
 These remarks certainly support an inference that several of White's co-workers and supervisors were dubious about, and even resentful of, women working in Chemical Processing and were not reluctant to let White know as much. Dial attempts to discount many of these remarks, suggesting that they were spoken out of concern for White or frustration with her failure to complete her work or honor the chain of command. The context of a particular remark might possibly be relevant to an assessment of its discriminatory impact, particularly when the remark is an isolated one; yet, a sexist remark is no less so simply because it is made out of concern or frustration rather than a conscious intent to taunt or offend. In any event, White's testimony suggests a pattern of remarks reflecting an animus toward women, and we agree that such a pattern lends some support to her claim of a hostile working environment.
 
 
 20
 One might also argue that Huber's purported animus to White as a female worker should be read into his supervisory decisions concerning her entitlement to interim pay raises, breaks, and overtime opportunities. For example, according to White, when Huber discovered that White had spoken with his supervisor about a raise, "[h]e told me that I don't get a raise until he say[s] I get a raise." White Tr. 248; see also id. at 267-68, 414 ("I'm not going to give you a raise. I don't care who you go to."). It was during this same heated conversation, according to White, that Huber suggested she return to Soap Finishing, "where the women[ ] were." White Tr. 414.
 
 
 21
 But even if we assume arguendo that such inferences would go some way toward presenting a triable claim of a hostile work environment, we are not persuaded that White has presented enough evidence to survive summary judgment on the question of constructive transfer. On that question, White's burden is to tender evidence from which a jury might conclude that her work environment was so discriminatorily hostile that a reasonable person in her position would have felt compelled to resign or transfer out of the A-5 position. See Chambers, 17 F.3d at 1003-04. "Enforced idleness or a humiliating experience, as well as one that may permanently impair an employee's professional skills, may be considered when determining if a constructive discharge has occurred, and additional consideration may be given to whether there has been a pattern of discriminatory treatment over time directed toward the employee." Marcing v. Fluor Daniel, Inc., 826 F.Supp. 1128, 1141 (N.D.Ill.1993) (citing Taylor v. Western & Southern Life Ins. Co., 966 F.2d 1188, 1193-94, 1199 (7th Cir.1992), and Rutan v. Republican Party of Illinois, 868 F.2d 943, 950 (7th Cir.1989) (en banc), aff'd in part, rev'd in part on other grounds, 497 U.S. 62, 110 S.Ct. 2729 (1990)), rev'd in part on other grounds without published opinion, 36 F.3d 1099 (7th Cir.1994); see generally Note, Choosing a Standard for Constructive Discharge in the Title VII Litigation, 71 Cornell L.Rev. 587 (1986). Certainly no single incident stands out in the record as sufficiently hostile in and of itself to compel a reasonable person's departure; indeed, White herself relies on the cumulative effect of the allegedly discriminatory acts she has cited. Opening Br. at 9, 21; Reply Br. at 5. But even the totality of these acts does not support an inference that White was forced into a transfer. With the possible exception of one or two incidents, it appears that White was permitted at least one break daily[9]; and she has not offered us reason to believe that being deprived of additional breaks made her work intolerable. The possibility that she was denied interim pay raises based on her accomplishments in training is potentially troubling, but the modest nature of these raises (ten to fifteen cents per hour at each step, see R. 68, Def.Ex. B at 51), not to mention the brevity of White's overall tenure in Chemical Processing, belies any notion that White had no choice to resign. See Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65-66 (5th Cir.1980) (unequal pay and disappointment at failure to receive expected pay raise not sufficient to establish constructive discharge). Finally, the sexist remarks White has attributed to Huber and her co-workers, although offensive, were neither so demonstrably pervasive nor so severe that either alone or coupled with the other alleged injustices they would have compelled the reasonable employee to transfer to another department or another job.
 
 
 22
 White has alluded to other problems in the course of this litigation, including inadequate safety training, the use of foul language by Huber and her co-workers, and not being given the chance to work overtime. These have been noted only in passing on appeal, without any discussion of the relevant evidence contained in the record. The district court addressed each of them, finding no evidence that White was treated differently because of her gender in these areas. In any case, we are confident that they do not help to establish a constructive transfer in this case: any shortcomings in safety training appear to have been limited to the first week or two of White's training[10]; the cursing was not shown to have been so intense (or even out of the ordinary in the workplace) that a reasonable person might not have been able to bear it; and whatever overtime opportunities that might have been foreclosed to White were not so significant that without them she would be forced from the job (cf. Bourque, 617 F.2d at 65-66).
 
 
 23
 Many of the more noteworthy problems White purportedly experienced seem to have emanated from her difficult relationship with supervisor Dan Huber--perhaps the quintessential heavy-handed manager. But "[e]ven if [Huber] were 'a heavy-handed manager who dealt poorly with subordinates[,] [t]hat kind of manager is (unfortunately) not a rare breed, and simple mismanagement does not constitute constructive discharge." Phaup v. Pepsi-Cola Gen. Bottlers, Inc., 761 F.Supp. 555, 561 (N.D.Ill.1991) (quoting Miller, 681 F.Supp. at 544). Moreover, the record offers us little justification to deem White's entire experience in Chemical Processing unbearable due to Huber's possibly blunt management. White did, according to her own testimony, find support among Huber's superiors, and although she was also chastised for her attempts to circumvent him, she has not pointed to evidence suggesting that Dial, as her employer, effectively foreclosed every reasonable means of resolving her grievances except abandoning the A-5 position.
 
 III.
 
 24
 White failed to produce evidence from which one might infer that a reasonable person would have felt compelled to transfer from Dial's Chemical Processing Department, as she decided to do. Consequently, the remedies of backpay[11] and reinstatement that White sought were precluded, and the district court was correct to enter summary judgment against White.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 White's complaint also asserted a claim against her union, United Food & Commercial Workers Local 100-A, AFL-CIO & CLC. That claim was dismissed by the district court and White has not appealed that dismissal
 
 
 [2]
 White's other employment benefits remained the same upon her return to Soap Finishing
 
 
 [3]
 The discriminatory experiences of which White complains pre-dated the 1991 Civil Rights Act, which broadened the remedies available to Title VII plaintiffs. See Landgraf v. USI Film Prod., Inc., 114 S.Ct. 1483 (1994)
 
 
 [4]
 We have not yet decided (and we need not do so here) whether the employer must have "manipulate[d] the attributes of the job for the purpose of driving the employee to quit." Henn v. National Geographic Soc., 819 F.2d 824, 829 (7th Cir.) (emphasis supplied), cert. denied, 484 U.S. 964, 108 S.Ct. 454 (1987)
 
 
 [5]
 Unfortunately, our review has been hampered by White's failure below to file a proper response to the factual statement Dial submitted in compliance with the Northern District of Illinois' Local General Rule 12(m). Contrary to the provisions of Rule 12(n), White merely peppered her memorandum in opposition to summary judgment with footnotes bearing citations to the record, without responding directly and individually to each of the assertions in Dial's 12(m) statement. Although White did tender a separate factual statement of her own, it was in no way responsive to Dial's factual summary, and in a number of instances merely duplicated Dial's own assertions. See District Court's Mem.Op. and Order at 2, n. 2. This approach was wholly improper, and the district court would have been well within its discretion to strike White's papers. See generally Waldridge v. American Hoechst Corp., 24 F.3d 918, 923-24 (7th Cir.1994)
 
 
 [6]
 To succeed in establishing a constructive discharge or transfer, White must show that not only that she perceived her environment in Chemical Processing to be abusive, but that a reasonable person would have so perceived it as well. Harris v. Forklift Sys., Inc., 114 S.Ct. 367, 370 (1993); Saxton, 10 F.3d at 534. We shall assume that the evidence was sufficient to support the inference that White found the atmosphere in Chemical Processing to be unbearable, and shall focus our analysis on whether a reasonable person would have found it so as well
 
 
 [7]
 The district court seemed to think that White conceded that Huber had never remarked that the A-5 position was not a woman's job. See Mem.Op. and Order at 19 & n. 22. Viewed in context, however, it appears that White merely meant that she couldn't recall Huber making this particular remark after a given point in time. See White Tr. 334, 338. In fact, as the discussion above reveals, White did attribute a number of sexist remarks to Huber
 
 
 [8]
 White contends that Martinez acknowledged overhearing one of Huber's remarks, but the relevant pages of his deposition have not been included in the record before us
 
 
 [9]
 White's counsel indicated at oral argument that there were no more than two occasions on which White was denied a break altogether
 
 
 [10]
 White's concerns about inadequate safety training spring from a mishap that occurred early in her tenure when she was splashed with, although not injured by, hot steam while opening an evidently broken trap door. The district court examined the record as to this incident and found no evidence to support the notion that White was denied training on the basis of her sex. Mem.Op. and Order at 11-13. White has supplied us with no reason to believe this assessment was incorrect
 
 
 [11]
 White has not suggested that she also seeks compensation for the interim pay raise(s) she failed to receive while she still remained an A-5 trainee. The amount would no doubt be quite modest in any event, given the short period she worked in Chemical Processing