Diana WASHINGTON, Plaintiff,

v.

JENNY CRAIG WEIGHT LOSS CENTRES, INC., Defendant.

No. 95 C 3740.

United States District Court, N.D. Illinois, Eastern Division.

May 8, 1998.

942

Larry M Dreyfus, Chicago, IL, for Plaintiff.

Gerald J. Huffman, Jr., David M. Whitaker, Lemle & Kelleher, New Orleans, LA, Todd H. Thomas, Law Offices of Todd H. Thomas, Skokie, IL, for Defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is Defendant's Motion for Partial Summary Judgment. For the following reasons, Defendant's motion is granted.

### I. BACKGROUND [1]

■ On February 27, 1992, Defendant, Jenny Craig Weight Loss Centres, Inc. ("Jenny Craig"), hired Plaintiff, Diana Washington ("Washington"), as a receptionist at its Centre located in Joliet, Illinois ("Joliet Centre"). Initially, Washington interviewed with the Centre Director at the Joliet Centre, Linda McCorkle ("McCorkle"), for a position as a Weight Loss Counselor ("counselor"). However, McCorkle advised Washington that the only position available was that of a receptionist. McCorkle further advised Washington that receptionists are normally promoted to counselors within three to four months, and that Washington would be next in line for the promotion. Washington was the only black employee at the Joliet Centre until the summer of 1994.

Between February 1992 and January 1993, Washington informed McCorkle of her desire to be promoted from receptionist to counselor. Nevertheless, McCorkle refused to promote her and hired three white individuals instead as counselors. In addition, McCorkle made racially discriminatory comments towards Washington and disciplined her more strictly.

As a result, Washington advised various members of Jenny Craig's Regional Task Force, which supervised the Joliet Centre, of McCorkle's discriminatory conduct. Wash-

---

1. The undisputed facts for this opinion are taken from the court's reconciliation of the parties' Local Rule 12(M) and 12(N) statements. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997) (discussing Local Rule 12(M) and 12(N)); *Huff v. UARCO*, 122 F.3d 374, 382–83 (7th Cir.1997) (same). Pursuant to Local Rule 12(N)(3)(b), Plaintiff set forth additional material facts. Since Defendant failed to file a response to Plaintiff's 12(N)(3)(b) statement, the court deems Plaintiff's additional material facts as admitted for purposes of this motion. *See* Local Rule 12(M).

ington also arranged for her Regional Supervisor, Joann Capezio–Augur ("Capezio"), to interview a black client of the Joliet Centre, Karen Kennedy ("Kennedy"). Kennedy informed Capezio that she believed that McCorkle had problems with people of different races and that McCorkle discriminated against blacks; Capezio then advised Jenny Craig's corporate headquarters.

Washington also complained to Capezio that McCorkle refused to promote her from receptionist to counselor. After Washington threatened to file a complaint with the Equal Employment Opportunity Commission ("EEOC"), Capezio arranged for Washington to be promoted to the position of counselor; Washington was promoted on February 5, 1993.

Thereafter, McCorkle and her assistant, Barbara Pecky ("Pecky"), caused Washington's client schedules to be changed. These changes adversely affected Washington's relationship with her clients and her income. Washington informed her new Regional Supervisor, Stacey Sawyer Koroluk ("Koroluk"), about the schedule manipulations and the disparate treatment she endured. Washington also told Koroluk that she was considering going to the EEOC.

In May of 1993, Washington called Jenny Craig's Human Resources Department in California and advised the head of the department, Marguerite Agrella, that "McCorkle had called her a 'nigger' and had treated her in racially discriminatory manner." (Pl.'s 12(N) Stmt. at ¶ 16.) Agrella promptly advised Capezio of Washington's complaint of race discrimination and directed Capezio to contact both Washington and McCorkle. Capezio took no further action.

On March 8, 1994, a white client of the Joliet Centre, Rose Chappel ("Chappel"), advised Koroluk that "McCorkle talked to the 'Black counselor' [Ms. Washington] ' . . . like a dog.'" Id. at ¶ 19 (alteration in original). Koroluk also documented that another employee at Joliet Centre, Marie Esposito, reported that Washington was "picked on."

On March 9, 1994, Washington filed a race discrimination charge with the EEOC.

On March 28, 1994, another client of Joliet Centre, Marie Lynch, telephoned Koroluk and reported that she observed McCorkle treat Washington in a discriminatory manner and heard McCorkle refer to Washington as a "nigger." On March 28, 1994, Kennedy informed Koroluk, as she had advised Capezio, that she believed that McCorkle discriminated against black clients and employees. In early April of 1994, Chappel also notified Koroluk that she heard McCorkle call Washington a "nigger."

On April 4, 1994, Jenny Craig terminated McCorkle because of, among other things, her racially offensive conduct. Washington continued to work for Jenny Craig. On January 12, 1995, Washington was promoted from counselor to Program Director. At about the same time, Margaret Colarossi ("Colarossi") became the new Centre Director at the Joliet Centre.

After Colarossi became the Centre Director, Washington alleges she was subjected to the following acts of discrimination: (1) she was criticized for her poor body language; (2) she was not provided with company information; (3) she was required to cover shifts for the other white, Program Director, Megan Burke; (4) she was prohibited from earning commissions by providing client consultations; and (5) she was prohibited from talking with the other employees at the Joliet Centre. Washington allegedly complained to Koroluk about Colarossi's discriminatory conduct, but Koroluk allegedly took no remedial action.

On March 25, 1995, Washington filed a retaliation charge with the EEOC.

On May 18, 1995, Washington saw Dr. Mony Sarcu for headaches caused by job related stress. Washington also saw a psychologist, Dr. Melvin Hess. On July 5, 1995, Washington requested a leave of absence, advising Jenny Craig that she was "'being treated for a continuous migraine brought on by job related stress.'" (Pl.'s 12(N) Stmt. at ¶ 35.) On July 20, 1995, Washington provided a doctor's note from Dr. Hess to Jenny Craig which stated that she suffers from symptoms of severe depression. On August 29, 1995, Washington provided another note from Dr. Hess which advised that Washing-

ton could not return to work until September 11, 1995; Washington returned to work on September 18, 1995.

On May 14, 1996, Dr. Hess advised Jenny Craig that " '[d]ue to continuing depression in the face of work pressures, Diana Washington is allowed to work up to 15 hours per week. Working more than this could result in worsening depression.' " (Pl.'s 12(N) Stmt. at ¶ 38.) Even with the reduction of hours, however, Washington's condition continued until she resigned from Jenny Craig on December 14, 1996.

On June 27, 1995, Washington filed a Complaint in federal court against Jenny Craig, alleging race discrimination and unlawful retaliation. On December 5, 1997, Washington filed her First Amended Complaint and added a constructive discharge claim. On December 16, 1997, Jenny Craig refiled its motion for partial summary judgment on Washington's constructive discharge claim. The motion was fully briefed on January 12, 1998.

However, because the briefs did not adequately address two critical issues, the court ordered the parties to submit memoranda in support of their respective positions on the following two issues. First, whether Washington's constructive discharge claim was "included in her EEOC charge, (citation omitted), or ... are 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 481 (7th Cir. 1996). Second, whether the working conditions created by McCorkle can and should be considered along with the working conditions created by Colarossi to determine if Washington's working conditions were so intolerable as to force a reasonable employee to leave. *See Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 517 (1996).

The court emphasized that this was not an opportunity to allege additional facts. Yet the parties interjected additional facts in their supplemental memoranda. Local Rule 12 governs the means of presenting a statement of material facts. Thus, the facts will stand as they exist in the parties respective Local Rule 12 statements for purposes of this motion.

## II. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir.1997) (*quoting Newell v. Westinghouse Elec. Corp.,* 36 F.3d 576, 578 (7th Cir.1994)) (citation omitted).

■ "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering all the evidence presented in a motion for summary judgment, a court cannot make credibility determinations. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must "view the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party." *Sample v. Aldi, Inc.,* 61 F.3d 544, 546 (7th Cir.1995).

■ "If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Id.* at 547. "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Severn,* 129 F.3d at 427 (citations and internal quotation marks omitted). The non-moving party, therefore, will not survive summary judgment with merely a scintilla of evidence supporting its position. *See Essex v. United Parcel Serv. Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997).

"The question is whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Severn*, 129 F.3d at 427. Accordingly, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must not be granted. *O'Connor v. Chicago Trans. Auth.*, 985 F.2d 1362, 1366 (7th Cir.1993).

■ Before addressing the merits, the court must determine whether Washington can properly assert a constructive discharge claim. As a general rule, a plaintiff who files a Title VII complaint in federal court cannot assert claims that were not included in her EEOC charge. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996); *see also Benedict v. Eau Claire Public Schools*, No. 97–2513, 1998 WL 60374, at *9–10 (7th Cir. Feb. 10, 1998). " 'This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved.' " *McKenzie*, 92 F.3d at 481–82.

■ However, because most EEOC charges are completed by laypersons, and not lawyers, Title VII plaintiffs may assert a claim in federal court that was not specifically included in their EEOC charges if the allegations contained in their federal complaints: (1) are "like or reasonably related" to the allegations contained in their EEOC charges and (2) can reasonably be expected to grow out of the EEOC investigation of the allegations contained in their EEOC charges. *Id.* at 481.

Relying on *McKenzie*, Washington argues that her constructive discharge claim is reasonably related to the allegations in her EEOC charges, and properly before the court. In *McKenzie*, the Title VII plaintiff failed to allege retaliation in her EEOC charges. *See McKenzie*, 92 F.3d at 482. Thus, the Seventh Circuit noted that plaintiff's retaliation claim may be considered by the court only if the allegations contained in her EEOC charges were reasonably related to the allegations in her complaint. *Id.* In making this determination, the Seventh Cir-

cuit found the Fifth Circuit's opinion in *Gupta v. East Texas State Univ.*, 654 F.2d 411 (5th Cir.1981), persuasive. *Id.*

In *Gupta*, the Fifth Circuit addressed whether a Title VII plaintiff may assert a retaliatory discharge claim, after filing a discrimination charge with the EEOC, without filing a retaliation claim with the EEOC. *Id.* "The Fifth Circuit held that it was 'unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge.' " *Id.* (citation omitted). Reluctant to create unnecessary procedural barriers, the Seventh Circuit similarly held that "only a single filing was necessary to comply with the intent of Title VII" when the " 'alleged retaliation arose after the charge of discrimination had been filed [with the EEOC].' " *Id.* (citation omitted).

■ Therefore, Washington concludes that if the acts that give rise to additional claims occur after the filing of the original EEOC charges, that the plaintiff need not file a subsequent EEOC charge, regardless of whether the additional claims are reasonably related to, and arose out of, the allegations in the EEOC charge. The court rejects such a broad interpretation of *McKenzie*. Rather, it seems that the Seventh Circuit concluded in *McKenzie* that a retaliation claim based on acts occurring after the filing of a discrimination claim with the EEOC is maintainable in federal court despite the fact that "retaliation" was not specifically mentioned in the EEOC charges because it was reasonably related to, and arose out of, the EEOC charges. *Id.* (Because Ms. McKenzie did not allege retaliation in her EEOC charges, "Ms. McKenzie's claim of retaliation may be considered by this court only if it can be said that there is a 'reasonable relationship' between the allegations against [defendant] found in the charge and the allegations of Ms. McKenzie's complaint."); *see also Gupta*, 654 F.2d at 414 (retaliation claim "grows out" of the earlier EEOC charge of discrimination).

Accordingly, the court must still adjudge whether the allegations contained in the federal complaint are like or reasonably related

to the allegations contained in the EEOC charges and can reasonably be expected to grow out of the EEOC investigation. *See Wright v. Methodist Youth Services*, No. 97 C 4459, 1998 WL 25200, at *1 (N.D.Ill. Jan. 12, 1998) ("[I]n *McKenzie* the Seventh Circuit recognized that a claim that her employer retaliated against plaintiff after she filed her charge may be 'reasonably related' to that charge."); *see also Nolan v. South Cent. Community Services, Inc.*, No. 95 C 2328, 1996 WL 473662, at *5 (N.D.Ill. Aug. 14, 1996) (Relying on *McKenzie*, the court determined that plaintiff's constructive discharge claim was reasonably related to his retaliation charge with the EEOC and that the EEOC's investigation would have encompassed his allegation of constructive discharge.). *But see Garcia v. Fry*, 972 F.Supp. 1133, 1139, n. 7 (N.D.Ill.1997) (The court stated that if the federal complaint alleged retaliatory acts occurring after the plaintiff filed her EEOC charge, that she was not required to show that there was a reasonable relationship between the allegations contained in the federal complaint and the allegations contained in the EEOC charge.); *Ratley v. City of Aurora*, No. 97 C 3422, 1998 WL 30697, at *3 (N.D.Ill. Jan. 22, 1998) (same).

▇ In this case, Washington filed two EEOC charges against Jenny Craig. One on March 9, 1994, for race discrimination, and another on March 25, 1995, for retaliation. On June 27, 1995, Washington filed a federal complaint against Jenny Craig, alleging race discrimination and unlawful retaliation. Thereafter, on December 14, 1996, Washington resigned from Jenny Craig. On December 5, 1997, Washington amended her complaint and added a constructive discharge claim. Since Washington did not suffer the alleged constructive discharge until after filing her EEOC charges, she did not and could not allege constructive discharge in either of her EEOC charges. Thus, the court can consider Washington's constructive discharge claim only if the allegations contained in the federal complaint are reasonably related to the allegations contained in the EEOC charges, and can reasonably be expected to be encompassed in the EEOC's investigation.

In order to determine whether Washington can properly maintain a constructive discharge claim based on race discrimination and retaliation, the court must first compare the allegations in the federal complaint with the allegations contained in Washington's EEOC charges. On March 9, 1994, Washington filed a charge of race discrimination with the EEOC, and alleged that Jenny Craig's Centre Director at the Joliet Centre, McCorkle, discriminated against her based on her race since June 30, 1993. More specifically, Washington alleged that she was subjected to terms and conditions of employment different from her non-black, co-workers, *e.g.*, she did not receive information at the same time; she was unable to speak to her Manager without witnesses; she was referred to as "you people"; and she received unjustified disciplinary write-ups. Washington stated that the latest date of discrimination took place on February 21, 1994, but also marked that the discriminatory conduct was continuing.

Over a year later, on March 25, 1995, Washington filed a charge of retaliation with the EEOC and alleged that she was discriminated against for having asserted her rights by filing a discrimination charge with the EEOC in March 1994. More specifically, Washington alleged that she was harassed, subjected to criticisms about her body language and work efforts with clients, and threatened with discipline. Although not specifically stated, it appears, based on the record before the court, that Washington is alleging that the Centre Director at the Joliet Centre who replaced McCorkle, Colarossi, was primarily responsible for these retaliatory acts. Washington stated that she was subjected to these retaliatory acts since the date of the original EEOC filing, and as recently as January 1995, but also marked that the retaliatory conduct was continuing.

Relying on the allegations contained in both EEOC charges, Washington alleges that she was constructively discharged. However, there is a distinction between a constructive discharge claim based on race discrimination and a constructive discharge claim based on retaliation. *See Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 516–17 (7th Cir.

1996) (constructive discharge claim as a result of discrimination based on plaintiff's religion and national origin); *Locke v. Gas Research Institute*, 935 F.Supp. 994, 1003 (N.D.Ill.1996) (distinguishing between a constructive discharge claim as a result of age or sex discrimination, and a constructive discharge claim as a result of retaliation); *Armstrong v. Woodlawn Org.*, No. 1997 WL 323847, at *3–4 (N.D. Ill. June 11, 1997) (constructive discharge claim as a result of retaliation).

Under the particular facts of this case, the distinction is critical in determining whether Washington's EEOC charges encompass Washington's constructive discharge claim. Hence, the court treats Washington's constructive discharge claim as two claims, one based on race discrimination and the other based on retaliation. Having done so, the court concludes that Washington's original EEOC charge of race discrimination did not encompass any kind of constructive discharge claim, and that Washington's second EEOC charge of retaliation only encompasses a constructive discharge claim based on retaliation.

 Washington's original EEOC charge was filed in March 1994, and complained of McCorkle's racially discriminatory conduct. McCorkle was terminated in April 1994. Washington alleges she was constructively discharged in December 1996. In order to show reasonable relationship, the federal complaint and the EEOC charge must at a minimum " 'describe the same conduct and implicate the same individuals.' " *McKenzie*, 92 F.3d at 481. Washington relies on McCorkle's racially discriminatory conduct, in part, to assert her constructive discharge claim, despite the fact that McCorkle was terminated approximately two years and eight months before Washington alleges she was constructively discharged. Nevertheless, since similar allegations are contained in Washington's original EEOC charge and the federal complaint, the court will presume reasonable relationship.

 Thus, the court must determine whether Washington's constructive discharge claim can reasonably be expected to grow out of the EEOC investigation of Washington's race discrimination. This is generally more difficult because "it requires speculation as to what the EEOC might or might not discover in the course of an investigation." *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994). Here, the court is convinced that the EEOC's investigation would not have encompassed Washington's constructive discharge claim for the following reasons: (1) Washington filed her original EEOC charge of race discrimination on March 9, 1994, which was approximately two years and nine months before Washington alleges she was constructively discharged; (2) Jenny Craig terminated McCorkle on April 4, 1994, because of, among other things, her racially offensive conduct, which was two years and eight months before Washington alleges she was constructively discharged, *see Saxton v. Am. Tel. and Tel. Co.*, 10 F.3d 526, 537 (7th Cir.1993) ("Of course, once Richardson [the offender] was gone, any behavior that might arguably have rendered Saxton's work environment intolerable was terminated"); and (3) Jenny Craig promoted Washington, who remained with the company after McCorkle's termination, from counselor to Program Director on January 12, 1995. Consequently, the court concludes that Washington's EEOC charge of race discrimination did not encompass her constructive discharge claim based on race discrimination.

 Washington's second EEOC charge of retaliation was filed on March 25, 1995, and complained of Colarossi's retaliatory conduct. In this charge, Washington did not allege any race discrimination. Given Washington's original EEOC charge of race discrimination, Washington certainly knew how to allege ongoing race discrimination. Instead, Washington unmistakably alleges that she was subject to harassment in retaliation for filing an earlier race discrimination charge with the EEOC.

"[R]etaliation and discrimination are separate and distinct wrongs. Indeed, the very gist of a retaliatory harassment action is that the employer has 'lashed out' against an employee for filing discrimination charges, not out of animosity for the employee's race or national origin." *Nair v. Bank of Am. Illi-*

*nois,* No. 95 C 6181, 1997 WL 827394, at *11 (N.D.Ill. Nov. 19, 1997). As such, the court concludes that a constructive discharge claim based on race discrimination is not reasonably related to the allegations of retaliation contained in Washington's EEOC charge.

Further, the court notes that Jenny Craig terminated the only person Washington ever alleged acted with racial animus, McCorkle, nearly one year before Washington filed her second EEOC charge and nearly three years before Washington alleges she was constructively discharged. Once McCormick was terminated, any behavior attributable to her that might have rendered Washington's working conditions intolerable was likewise terminated. *See Saxton,* 10 F.3d at 537; *see also Neal v. Honeywell, Inc.,* 958 F.Supp. 345, 348 (N.D.Ill.1997) (In a constructive discharge claim, the relevant working conditions are those that existed at the time of plaintiff's resignation); *Cameli v. O'Neal,* No. 95 C 1369, 1997 WL 351193, at *14–15 (N.D.Ill. June 23, 1997) (same). Hence, the court concludes that the EEOC's investigation of Washington's allegations of retaliation would not encompass her constructive discharge claim based on race discrimination. Consequently, the court concludes that Washington's EEOC charge of retaliation did not encompass her constructive discharge claim based on race discrimination, and grants Jenny Craig's motion for partial summary judgment to the extent that Washington seeks to state a constructive discharge claim based on race discrimination.

Nevertheless, in light of *McKenzie,* the court concludes that Washington's constructive discharge claim based on retaliation is reasonably related to her retaliation charge and can reasonably be expected to arise out of EEOC's investigation. In March 1995, Washington complained of retaliation and marked that the retaliatory conduct was ongoing. As early as July 1995, Washington informed Jenny Craig that she was suffering physical ailments as a result of her job related stress.

On July 5, 1995, Washington requested a leave of absence because she was suffering from a continuous migraine headache allegedly caused by job related stress. On July 20, 1995, Washington provided a doctor's note which advised that she was suffering from severe depression. Washington did not return to work until September 18, 1995. Approximately eight months later, on May 14, 1996, Washington provided another doctor's note which advised that Washington was limited to working up to 15 hours per week. Seven months thereafter, Washington resigned.

The court notes that there was a significant lapse of time between the second EEOC filing and Washington's resignation. This supports a finding of no reasonable relationship between Washington's constructive discharge claim and the allegations contained in the EEOC charge. However, since the ultimate alleged act of retaliation, *i.e.,* constructive discharge, occurred after the second EEOC filing, the court concludes that Washington's retaliation charge with the EEOC encompasses her constructive discharge claim based on retaliation. *See Nolan,* 1996 WL 473662, at *5 (Relying on *McKenzie,* the court determined that plaintiff's constructive discharge claim was reasonably related to his retaliation charge with the EEOC and that the EEOC's investigation would have encompassed his allegation of constructive discharge.). Therefore, the court will address the merits of Washington's constructive discharge claim based on retaliation. In doing so, the court will focus on her alleged working conditions after the filing of her race discrimination charge with the EEOC in March 1994.

In order to withstand a motion for summary judgment, Washington must present sufficient evidence to show that her working conditions were so intolerable in a discriminatory way that a reasonable person would be compelled to resign. *See Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996). This is a high standard. *See Drake v. Minnesota Mining & Mfr. Co.,* 134 F.3d 878, 886 (7th Cir.1998). "More than ordinary discrimination is necessary to establish a constructive discharge claim; in the 'ordinary' case, an employee is expected to remain employed while seeking redress." *Id.; see also Rabinovitz,* 89 F.3d at 489 (Plaintiff must

show he was "confronted with an aggravating situation beyond ordinary discrimination."); *McNaughton v. Appleton Elec. Co.*, No. 97 C 142, 1998 WL 142458, at *6 (N.D.Ill. March 20, 1998) ("Unless the conditions are beyond 'ordinary' discrimination, a complaining employee is expected to stay on the job."); *Campbell v. HSA Managed Care Systems, Inc.*, No. 97 C 1622, 1997 WL 610043, at *10 (N.D.Ill. Sept. 25, 1997) ("The discrimination must be 'beyond the fact of ordinary discrimination on the job.'"). Further, "an employee may not be unreasonably sensitive to his working environment." *Rabinovitz*, 89 F.3d at 489.

In Washington's retaliation charge with the EEOC in March 1995, Washington stated that she was subjected to retaliatory acts since the date of her original EEOC filing, and marked that the retaliatory conduct was continuing. However, Washington only alleges that she was subject to retaliatory conduct after Colarossi became the Centre Director in January 1995. Specifically, Washington alleges that she was subjected to the following acts of discrimination in retaliation for filing a race discrimination claim with the EEOC: (1) she was criticized for her poor body language; (2) she was not provided with company information; (3) she was required to cover shifts for the other Program Director, which resulted in Washington in doing more work; (4) she was prohibited from earning commissions by providing client consultations; and (5) she was prohibited from talking with the other employees at the Joliet Centre. Washington also alleges that she suffered physical and mental ailments as a result of these discriminatory acts.

 Washington bears the burden to show that the "severity or pervasiveness of the abuse" was so great that any reasonable person would be compelled to resign. *See White v. Dial Corp.*, 52 F.3d 329 (Table), 1995 WL 218535, at *2 (7th Cir. April 6, 1995). However, the record before the court only contains "sparse information, and even sparser analysis, on several of these alleged incidents." *See Ibarra v. Martin*, No. 96–3777, 1998 WL 191783, at *16 (7th Cir. April 23, 1998). For example, Washington does not specifically identify the alleged offender, the dates she suffered the alleged discriminatory acts, or the pervasiveness of the acts.

 Nevertheless, even assuming that Washington can show that Jenny Craig's alleged retaliatory conduct occurred throughout her employment, the court concludes that Jenny Craig's alleged discriminatory conducts did not create an aggravating situation beyond ordinary discrimination, compelling a reasonable person to resign. *See Drake*, 134 F.3d at 886; *see also Rabinovitz*, 89 F.3d at 489; *McNaughton*, 1998 WL 142458, at *6; *Campbell*, 1997 WL 610043, at *10. Washington has failed to present sufficient evidence to show that Jenny Craig's alleged conducts were so severe and intolerable that a reasonable person could not be expected to endure it while seeking redress, and that a reasonable person would be compelled to resign. *Id.*

Review of other cases shows that more severe allegations of intolerable working conditions were rejected. *See Moreno v. South Shore Hosp. Corp.*, No. 96 C 6945, 1998 WL 164872, at *4 (N.D.Ill. April 3, 1998) (cases cited therein). For example, in *Rabinovitz*, the plaintiff alleged that he was subjected to constant mean, humiliating insults; received a lowered performance rating, denying him a $600 bonus; subjected to unfair workplace restrictions; denied a request to start work at 6:00 a.m.; forced to take a business trip on the day an EEOC investigator arrived to investigate his discrimination claim; and told that he could quit if he was unhappy with his job. *See Rabinovitz*, 89 F.3d at 489. Yet the Seventh Circuit in *Rabinovitz* held that these allegations, at most, suggested that friction existed, not that his working conditions were so intolerable that he was forced to resign. *Id.*

In *White*, the plaintiff alleged that she was denied salary increases; subject to sexist remarks; provided inadequate safety instructions; berated and cursed by co-workers; denied sufficient breaks; prohibited from earning additional compensation by working overtime; and unreasonably monitored by her supervisors. *White*, 1995 WL 218535, at *1. The Seventh Circuit held in *White* that while these alleged conducts may evidence a

hostile working environment, it was insufficient to show that a reasonable employee would have been compelled to transfer to another department or another job. *Id.* at 2, 4–5 ("Circumstances that might be adequate to establish a hostile working environment for purposes of Title VII will not necessarily suffice to establish a constructive discharge."); *see also Davis v. Univ. of Chicago Hospitals*, No. 93 C 5324, 1996 WL 66120, at *2 (N.D.Ill. Feb. 12, 1996) (No constructive discharge claim was supported by plaintiff's allegations of unfair discipline; unfair assignment to carry the heaviest trays; denial of bathroom breaks, which caused her to urinate on herself on four to six occasions; denial of regular lunch breaks; and close supervision.).

"The conditions must be so beyond the ordinary forms of discrimination that any reasonable employee would be expected to resign under the circumstances." *Id.* At most, Washington can show that she was subject to ordinary retaliation, *e.g.*, isolation, additional workload, and diminished opportunities. It is not sufficient to show that Washington's alleged working conditions at the time of her resignation were so beyond ordinary discrimination that any reasonable person would be compelled to resign. Further, the court is mindful that Washington allegedly suffered physical and mental ailments as a result of these discriminatory acts. However, the relevant inquiry is objective, not subjective. *Id.* Thus, while Washington's physical and mental ailments support her subjective necessity to resign, they do not establish that a reasonable person under such circumstances would have felt the same compulsion. Therefore, the court grants Jenny Craig's motion for partial summary judgment.

## III. CONCLUSION

For the foregoing reasons, the court grants Jenny Craig's motion for partial summary judgment as to Washington's constructive discharge claim. The case is set for trial on July 6, 1998, at 10:00 a.m. for Washing-

ton's remaining claims. The final pretrial order is due on or before June 8, 1998.

IT IS SO ORDERED.